Anthony D. Prince (SBN # 202892)
General Counsel, California Homeless Union/Statewide Organizing Council
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100
Berkeley, CA 94705
Tel: 510-301-1472

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SACRAMENTO HOMELESS UNION, a local of the CALIFORNIA HOMELESS UNION/STATEWIDE ORGANIZING COUNCIL, on behalf of itself and its members; ANTWONN BROOKS; AMBER CRISWELL-TIPPINS; KIANA CASH; SHAYLYNN DOXIE; MARCELLA PARKS; PATRICIA MILLER; ERIC MOORE; TANIKA WILLIAMS; TANA SAITO; HASAWNI PEETE; IVEE STOTTS; MARTIN O'RAY; MONAE RIDDLE; TATTIANA HEARST; CHERISE GREEN; UNIKA BROADWAY; SAMANTHA RUBIO; DELANNA GONZALEZ; SHEILA LOWE; TATTIANA PALACA; AMY HECKART; JEFFREY SMITH; JONSHEY WILLIAMS; PATRICK MURPHY; HOLLY MERRITT; LAWRENCE GORE; MARIAH MURPHY; IDA LOCKETT; JOHN AND JANE DOES A–B (adult members of "Household A"), each individually and on behalf of their minor children,; JANE DOES ONE AND TWO; and all those similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF SACRAMENTO, a municipal corporation; BRIAN PEDRO, Director of City Department of Community Response (DCR), sued in both his official and individual capacities; STEP UP ON SECOND STREET, INC., a California nonprofit corporation; Owners and Managers of MOTEL 6 NORTHGATE; MOTEL 6 JIBBOOM; MOTEL 6 COLLEGETOWN; ARDEN ACRES MODULAR HOME PARK; and DOES 1–100, inclusive, <br><br> Defendants. | Case No.: <br><br><br> 1. Violation of 42 U.S.C. § 1983 – Fourth Amendment (Unreasonable Seizure of Property); <br> 2. Violation of 42 U.S.C. § 1983 – Fifth and Fourteenth Amendments (Uncompensated Taking); <br> 3. Violation of Title II of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12131 et seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; Title III of the ADA, 42 U.S.C. § 12181 et seq.; <br> 4. Violation of California Tenant Protections – Civ. Code §§ 1946.2, 1946.1, 789.3, 1940.2; <br> 5. Violation of 42 U.S.C. § 1983 – Fourteenth Amendment (Procedural Due Process); Violation of 42 U.S.C. § 1983 – Fourteenth Amendment (Substantive Due Process/State-Created Danger); <br> 7. Violation of the Violence Against Women Act <br> 8. Negligent Hiring, Retention, and Supervision; <br> 9. Breach of Mandatory Duties – Cal. Gov. Code § 815.6 (Shelter Program Standards) <br> 10. Violation of Article 1, Section 1 of the California State Constitution (Inalienable Right to Pursue and Obtain Safety) <br> 11. Breach of Contract – Third Party Intended Beneficiary; Promissory Estoppel <br> 12. Fraud <br> 13. Civil Conspiracy <br> 14. Intentional Infliction of Emotional Distress <br> 15. Negligent Infliction of Emotional Distress <br> 16.Violation of the California Fair Housing and Employment Act (FEHA) <br><br> JURY TRIAL REQUESTED |

COMPLAINT - 1

## I.    INTRODUCTION

"I did not go quietly. I called every news station. I sent press releases at1:30 in the morning. I made voicemail after voicemail. I called 211. I called the California Attorney General. I stood outside that motel and I told the truth on camera.

I did all this while disabled, while homeless, while my son was sent away for his safety, and while my service dog stood beside me in the heat."



--Ida Lockett, Plaintiff and Homeless Union member evicted from Motel 6 Northgate on June 1, 2026



Unable to get comfortable sleeping in the back of their van, Amy Heckart, 46, and her son, Keith-Dalton Smith, 11, look out at other residents sleeping in their vehicles in a Taco Bell parking lot in Sacramento on Thursday. Heckart had been locked out of the Motel 6 after changes to a city-funded program.

RENÉE C. BYER/rbyer@sacbee.com

Antonita Brown, 33, right, is hugged by her daughter, Aliveeya, 13, near the car the family expects to sleep in after they were not allowed back into the Motel 6 shelter where they had been staying with Brown's husband on Wednesday, June 3, 2026, in Sacramento. Families were told to vacate the shelter Monday morning and were informed they could return at 3 p.m., but they were later denied reentry.

RENÉE C. BYER/rbyer@sacbee.com

COMPLAINT - 2

1.      This action arises out of Defendant City of Sacramento's mismanagement and abrupt, no-notice termination of its City Motel Shelter Program (formerly the Motel Voucher Program) and successor Emergency Shelter Voucher ("ESV") for Families program (collectively, the "Program"), for which the City received both state and federal funding.

2.      On June 1, 2026, acting through its contracted agent, Defendant Step Up on Second Street, Inc. ("Step Up"), and through the motel and mobile-home-park operators participating in the Program, the City carried out a mass eviction. Program participants were told — consistent with a weekly cleaning routine they had followed for months or years — to vacate their rooms by 8:00 a.m. so the rooms could be "cleaned," and that they would be re-placed upon their return. When they returned as instructed, they were locked out. Many were not told until approximately 5:30 p.m. that they would not be allowed back in. Their remaining belongings were placed on the street and discarded.

3.      On information and belief, at least 45 minor children — including two infants, one of them a four-month-old with an immune deficiency — were rendered homeless or placed at imminent risk of homelessness by Defendants' conduct. Families are now sleeping in cars and parking lots in triple-digit summer heat. Two of Plaintiff Samantha Rubio's young sons have already been held at gunpoint while sheltering in the family car. A 78-year-old disabled Marine Corps veteran, Plaintiff Patrick Murphy, is living in his vehicle without the electricity he needs to operate the nebulizer that allows him to breathe.

4.      Some participants who sought placement under the successor voucher program were told, for the first time and without any prior notice, explanation, or opportunity to be heard, that they had been placed on a "DNR" ("Do Not Register") list that barred them from every participating motel. Others, who remained at Arden Acres Modular Home Park because they had

COMPLAINT - 3

nowhere to go, now face formal eviction proceedings brought without the just cause or notice California law requires.

5.     The City took these actions with full knowledge of its contractor's record. The City retained Step Up from 2020 through 2026 — renewing or extending its contract in June 2023, June 2024, February 2025, and February 2026 — despite publicly reported allegations of fraud and breach of contract, a civil fraud action brought by the California Attorney General that Step Up settled on June 29, 2026 by agreeing to repay the State of California $3 million in misappropriated funds, a 2024 lawsuit by an unhoused family alleging retaliatory eviction and illegal lockout, repeated public warnings by a member of the City's own Council, and the City's own 2025 audit documenting Step Up's failures.

6.     Plaintiffs bring this action under 42 U.S.C. § 1983 for violations of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title III of the ADA, 42 U.S.C. § 12181 et seq.; and under California statutory and common law. They seek a temporary restraining order and preliminary injunction, declaratory relief, and damages.

## II. JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3)–(4) (civil rights), because this action arises under the United States Constitution, 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

8.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form

COMPLAINT - 4

part of the same case or controversy arising from a common nucleus of operative fact — the termination of the Program and the June 1, 2026 mass displacement.

9.    This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 65 of the Federal Rules of Civil Procedure.

10.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), because all Defendants reside and conduct business in this District.

## III. PARTIES

### A. Plaintiffs

11.    Plaintiff **SACRAMENTO HOMELESS UNION** (hereinafter "SHU" or "The "Union") is an unincorporated membership association of over 4,600 unhoused, formerly unhoused and marginally-housed persons in the Sacramento area and a local within the California Homeless Union/Statewide Organizing Council, including the individual Plaintiffs herein. The Union sues on behalf of itself and its affected members. Its members would otherwise have standing to sue in their own right; the interests it seeks to protect — its members' safety, shelter, and civil rights — are germane to its organizational purpose; and the declaratory and injunctive relief requested does not require the participation of each individual member in the litigation.

12.    The individual Plaintiffs identified below are all Sacramento Homeless Union members or otherwise represented by the Union members and were all participants in the Program, resided in Program placements at Motel 6 Northgate, Motel 6 Jibboom, Motel 6 Collegetown, the Executive Inn, or Arden Acres Modular Home Park, and were displaced, locked out, or placed under threat of eviction by the conduct alleged herein.

COMPLAINT - 5

**Plaintiffs Displaced from Program Motels on June 1, 2026**

13.     Plaintiff **TATTIANA PALACA,** age 35, resided at Motel 6 Northgate with her 17-year-old son and her 12- and 10-year-old daughters after approximately one year in the Program. On June 1, 2026, after vacating her room as instructed, she was informed at approximately 5:30 p.m. that she would not be permitted to return. When she sought placement under the successor voucher program she was told, for the first time, that she had been designated "DNR" — "Do Not Register" — and would not be permitted to check into participating motels. She was never given advance notice of the designation, the reasons for it, or any opportunity to contest it. The designation followed approximately one week after she reported the theft of her cellular telephone, and she reasonably fears it was retaliatory.

14.     Plaintiff **SAMANTHA RUBIO** is a single mother of two sons, ages 7 and 9, displaced from Motel 6 Jibboom. Ms. Rubio was born with one arm and is disabled. On June 1, 2026, her case manager told her by text that she did not know where Ms. Rubio should go and advised her to call motels herself and to try 211. Ms. Rubio sheltered in her four-door sedan with her sons for days while every motel on the referral list told her no rooms were available; Motel 6 Northgate eventually disclosed that no referral had ever been placed for her, and her case manager then told her she was on a "do not register" list. She has never received any justification for that designation. Since losing her room, Ms. Rubio and her sons have had a gun pulled on them while living in the car, and she has filed a police report.f

15.     Plaintiff **DELANNA GONZALEZ**, age 36, is a single mother of four children, ages 19, 17, 11, and 2, displaced from Motel 6 Northgate. Her two-year-old son has Level III autism, is nonverbal, and requires consistent routine. Ms. Gonzalez has diagnosed anxiety, depression, and PTSD. Her promised transfer placement fell through days before June 1; on June

COMPLAINT - 6

her room key was deactivated while she was still retrieving her belongings; and she waited until approximately 9:00 p.m. — with no information — before being told a room was available. Her repeated requests for a lower-floor room to accommodate her son's autism-related head-banging behaviors were ignored, and her son suffered facial injuries from an unsecured air-conditioning unit in her room.

16.     Plaintiff **KIANA CASH** resided at Motel 6 Northgate for approximately one and a half years with her spouse Leonard Carter and her two minor children, ages 4 and 11. On June 1, 2026, she vacated her room by 8:00 a.m. for "deep cleaning" as instructed; at approximately 5:00 p.m. she was told she would not be allowed to return. Her family's belongings had been placed outside the rooms and food spoiled in the heat; no instructions were given regarding retrieval or safeguarding of property. When she attempted to secure a room from the approved motel list using her own funds, she was told she was categorized "do not register" and denied placement. She and her children are living in their vehicle.

17.     Plaintiff **SHEILA LOWE**, age 50, is a single mother of a 12-year-old daughter, displaced from Motel 6 Northgate. Ms. Lowe has Type 2 diabetes and lupus and relies on a service dog trained to alert her to dangerous blood-sugar levels. She first experienced homelessness as the result of domestic violence.

18.     Plaintiff **IDA LOCKETT** is a senior and single mother of a 15-year-old son with autism, ADHD, and sensory processing disorder, displaced from Motel 6 Northgate. Ms. Lockett is disabled, uses a walker, and relies on a trained service dog. She is an abuse survivor who entered the Program with a VAWA housing voucher carrying enhanced privacy, eviction, and transfer protections. Her written requests for reasonable accommodations were repeatedly denied by Step Up and motel staff, who told her they "do not make accommodations" because Motel 6

COMPLAINT - 7

is "privately owned," and she was disciplined for accommodations her disability requires, including a write-up for not holding her service dog's leash while gripping her walker.

19. Plaintiffs **PATRICK MURPHY, HOLLY MERRITT, LAWRENCE GORE, and MARIAH MURPHY** are members of a single household displaced from Motel 6 Northgate, where they had been placed by the Program approximately two days earlier after being required to leave Arden Acres. Mr. Murphy is a 78-year-old honorably discharged U.S. Marine Corps veteran with diabetes, severe neuropathy, COPD, and mobility limitations who requires electricity to operate a nebulizer. On June 1, 2026, the household vacated at approximately 8:00 a.m. on instructions that they could return at 3:00 p.m.; on return, they were refused re-entry without explanation while others were re-admitted. Mr. Murphy has since lived in his vehicle without reliable electrical access for his breathing equipment, and has stated, "This can kill me." Ms. Merritt, her 14-year-old daughter, and other family members slept in a parking lot and now live in a truck; Ms. Merritt suffers from a herniated disc that has significantly worsened. Mr. Gore is sleeping outdoors in a park.

20. Plaintiff **CHERISE GREEN**, age 53, is the mother and IHSS care provider of her 11-year-old autistic son, K.S. (a minor, through his guardian ad litem), displaced from Motel 6 Collegetown, where they had resided since approximately November 2025. Both have diagnosed PTSD; her son is the victim of a prior violent crime.

21. Plaintiff **UNIKA BROADWAY** is a single mother of three minor children, ages 5, 7, and 10, displaced from Motel 6 Collegetown. Two of her children are disabled: her 10-year-old daughter has an active Individual Education Plan (IEP) and her 5-year-old son is diagnosed with autism.

COMPLAINT - 8

22.    Plaintiff **JONSHEY WILLIAMS** was displaced from Motel 6 Northgate. Mr. Williams is disabled and suffers from depression and ongoing mental-health challenges. He is formerly incarcerated and working toward stable employment; he complied with all instructions given him on June 1, 2026 and was nevertheless denied re-entry and left without shelter.

23.    Plaintiffs **AMY HECKART** and **JEFFREY SMITH** shared a Program unit at Motel 6 Northgate since April 2024 and were displaced on June 1, 2026.

24.    Plaintiffs **HASAWNI PEETE** (a single father of one daughter and an approximately four-year Program participant formerly residing at Arden Acres), MARTIN O'RAY, and MONAE RIDDLE were likewise displaced from their respective Program placements on or about June 1, 2026 and are experiencing homelessness or acute housing insecurity.

25.    **Plaintiffs DOES A-B** ("Household A") are the adult parents of a four-month-old infant, displaced from Motel 6 Jibboom. The infant and one parent are particularly sensitive to extreme heat. Following displacement, one parent collapsed from heat exhaustion on the street while carrying the infant, and the family's belongings were stolen while that parent was unconscious. Household A proceeds pseudonymously due to safety concerns; Plaintiffs will move for leave to proceed under pseudonym. (Plaintiff will file a motion for leave to proceed pseudonymously.)

26. Plaintiff **IVEE STOTTS** is a single mother of a four-year-old son who resided at Arden Acres for approximately two years before displacement. She has severe anxiety and PTSD following a 2023 carjacking in which she was pistol-whipped. On or about May 29–June 1, 2026, Arden Acres personnel told her she could leave her belongings and return for them; instead, her property — including her son's toys — was discarded.

COMPLAINT - 9

27. Plaintiff **TATTIANA HEARST** is a single mother of four children displaced from Arden Acres. She has a behavioral-health disability requiring emotional support animals, and has maintained continuous employment since July 2025. She was not assigned a housing navigator until approximately January 2026, and that navigator disclosed she was managing approximately 500 families.

**Plaintiffs Facing Eviction at Arden Acres Modular Home Park**

28. Plaintiff **Jane Doe One**, age 45, is a single mother of three minor children, all of whom have diagnosed disabilities including autism, ADHD, and learning disabilities. Ms. Doe Two has bipolar disorder, PTSD, borderline personality disorder, anxiety, and insomnia, and a broken foot. She works from home as a tax preparer and is an ordained minister. Her family is in hiding from the children's father following the sexual assault of her eldest daughter, and eviction would strip them of the protections that shield them from their abuser.  She was a resident in a city-overseen shelter program operated by the nonprofit Step Up on Second, where my assigned case managers supported my household while we were placed at Arden Acres Modular Home Park.

29. Her minor children have all been diagnosed with various learning and other types of disabilities. While placed at Arden Acres Modular Home Park, we were in a setting that was significantly more suitable for our family's needs than hotel-based placements. The modular housing provided essential space, cooking facilities, and refrigeration necessary to care for children with developmental and medical needs.

30. In March 2026, Ms. Doe One was informed that the City Motel Program was ending, that on June 1 a new nonprofit would be taking over and that participants would not be impacted.

COMPLAINT - 10

However, on May 30, 2026, a Step Up case manager sent her a group text message directing her to vacate her unit by 8:00 a.m. on Monday, June 1, 2026. No case managers were available to answer questions or provide support regarding relocation, transportation, or storage of belongings placing her at risk of losing essential belongings, including items necessary for the care of her children. The City and Step Up on Second told Ms. Doe One that that they would receive a 28-day hotel voucher valued at approximately $55 per night and were provided a list of hotels for placement.

31.  However, management at some of the participating motels told her that because she was on a "Do Not Register" (DNR) list, she would not be permitted to rent a room. Neither the City, nor Step Up nor any of the motels told her why she was on the DNR list. Additionally, several of the listed hotels charged daily rates that exceeded the $55 voucher rate. Unable to afford the difference, there was no place to go but the streets or other locations where she is at risk for encountering the abusive father of her children that she had fled.

26.    Plaintiff **AMBER CRISWELL-TIPPINS** has resided at Arden Acres since approximately 2022–2023 with Reginald Tippens and her grandchildren K.B.B. (age 6), K.L. (age 7), and K.M. (age 1), two of whom are diagnosed with autism and ADHD. She is disabled, has suffered four mini-strokes while residing at Arden Acres, is the primary caregiver and IHSS provider for one grandchild, and has received written acknowledgement of her tenancy from Arden Acres. The only alternative placement offered would move the family to an upper floor inaccessible for their disabilities and away from the school, counseling, employment, and caregiving supports on which the household depends.

27.    Plaintiffs **SHAYLYNN DOXIE** and **ANTWONN BROOKS** reside at Arden Acres with their minor children Mizani and Za'Amani Doxie. Ms. Doxie is employed at Dollar

COMPLAINT - 11

Tree; both children attend Northwood Elementary; Mizani has autism and ADHD and an active IEP, and disruptions in routine cause behavioral regression and emotional dysregulation.

28.    Plaintiffs **PATRICIA MILLER** and **ERIC MOORE** reside at Arden Acres with their 4-year-old son and 4-month-old infant, who was born premature and has an immune deficiency requiring special protection from illness and unsanitary conditions. Ms. Miller has degenerative disc disease, spinal deterioration, PTSD, social anxiety, and postpartum depression; Mr. Moore is employed by SafeLink. On June 1, 2026 the family could not use the alternatives offered: the emergency shelter they were directed to would not accept children, and the listed motels told them they were on a "do not register" list — a designation for which they have never received a write-up, discipline, or explanation. They remained in their unit and now face eviction.

29.    Plaintiff JANE DOE TWO **TANA SAITO** resides at Arden Acres with her five minor children (ages 16, 14, 13, 10, and 9); her three sons are diagnosed with autism. Ms. Saito has congestive heart failure, high blood pressure, PTSD, and anxiety. She is a domestic-violence survivor, her children are survivors of child abuse, and the family is in hiding from the children's father.

### B. Defendants

30.    Defendant CITY OF SACRAMENTO (the "City") is a municipal corporation and political subdivision of the State of California. The City conceived, designed, funded, administered, and oversaw the Program, including through its Department of Community Response; procured the state and federal funds that supported it; selected and contracted with the remaining Defendants; and made the decisions to initiate, extend, restructure, and terminate the Program through its highest officials, including the City Council and City Manager.

COMPLAINT - 12

31.     Defendant STEP UP ON SECOND STREET, INC. ("Step Up") is a California nonprofit corporation that contracted with the City beginning in 2020 to provide case management, placement, transition services, and day-to-day administration of the Program, and that carried out the June 1, 2026 displacement, the communications and misrepresentations preceding it, and the administration of the "DNR" exclusion list, all as the City's agent and in joint action with the City.

32.     Defendants doing business as MOTEL 6 NORTHGATE, MOTEL 6 JIBBOOM, and MOTEL 6 COLLEGETOWN (the "Motel Defendants") are  business entities operating motels in Sacramento and, under contract with the City of Sacramento, were previously participants and integral components of the homeless shelter system known as the City Motel Program (CMP) . That program was terminated on March 30, 2026 but the same motels have now, as of June 1, 2026, become contractors, joint enterprise participants and agents for the City of Sacramento California in the City's newly-created HOUSING VOUCHER PROGRAM ("HVP") enforcing the City's directives including the June 1, 2026 lockout and the "Do Not Register ("DNR") list. Each Motel 6 location is also a place of public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(A).

33.     In 2024-2025 and the first five months of 2026, when these Defendant motels were participating in the City Motel Program, they were compensated by the City and collaborated with both the City and Defendant STEP UP ON SECOND. However, rather than actually assist the homeless motel residents to obtain permanent housing, STEP UP performed as an agent of the City under the City Motel Program and continues to do so under the Housing Voucher Program beginning on June 1,

COMPLAINT - 13

34.     Defendant doing business as ARDEN ACRES MODULAR HOME PARK ("Arden Acres") is, , a business entity operating a modular home park in Sacramento, California that housed Program participants under contract with the City and/or Step Up, has acknowledged in writing the tenancy status of Plaintiffs residing there, and has commenced or threatened eviction proceedings against them.

35.     Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 100, inclusive, and therefore sue these Defendants by fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. , each Doe Defendant is responsible in some manner for the occurrences alleged herein, including City officials, Step Up employees and case managers, and motel and park managers and staff acting under color of state law.

36.     At all relevant times, each Defendant was the agent, employee, contractor, or joint venturer of each other Defendant and acted within the course and scope of that agency, employment, contract, or joint venture, and each Defendant ratified the conduct of the others.

## IV. GENERAL FACTUAL ALLEGATIONS

### A. The City Motel Shelter Program

37.     In or about 2020, the City established the Motel Voucher Program, later formalized as the City Motel Shelter Program, using state and federal funds, to provide non-congregate shelter and supportive services to Sacramento's most vulnerable unhoused residents — elderly and disabled adults, formerly trafficked individuals, survivors of domestic violence, and families with minor children. Vulnerability documentation was a requirement of entry into the Program, and participants' disabilities and special needs were documented at intake and continuously updated through Step Up's case management. Certain participants, including

COMPLAINT - 14

Plaintiff Lockett, entered with Violence Against Women Act "VAWA" protected vouchers carrying enhanced privacy, eviction, and transfer protections.

38.     The City contracted with Step Up in 2020 to provide case management and administration for the Program and renewed or extended that contract in June 2023, June 2024, February 2025, and February 2026. Participants were placed in units at Motel 6 Northgate, Motel 6 Jibboom, Motel 6 Collegetown, the Executive Inn, and Arden Acres Modular Home Park, each operating under contract with and compensated by the City and/or Step Up.

39.     Program participants resided in their placements not as transient motel guests but as long-term residents: many, including Plaintiffs Cash (approximately 18 months), Palaca (approximately one year), Peete (approximately four years), Stotts (approximately two years), and Criswell-Tippins (around 4 years), occupied their units continuously for periods far exceeding thirty days, received mail there, enrolled their children in neighborhood schools, and had no other residence.

### B. The City's Knowledge of Step Up's Unfitness

40.     Throughout the Program, participants — including multiple Plaintiffs — reported substandard conditions in Program placements, including rodent and insect infestations, inadequate security resulting in theft, broken appliances, and ADA violations, and reported the absence of meaningful case management: uncompleted referrals, unprovided employment and supportive services, unanswered complaints, and failures to communicate crucial information, causing Plaintiffs to miss employment and housing opportunities that would have enabled them to exit the Program.

41.     In 2023, the Los Angeles Times reported on a fraud and breach of contract action brought by California Attorney General Rob Bonta naming Step Up as a defendant. In 2024, an

COMPLAINT - 15

unhoused family sued Step Up alleging breach of contract, negligent maintenance, retaliatory eviction, and an illegal lockout. On June 29, 2026, Step Up settled the Attorney General's civil fraud action, agreeing to repay the State of California $3 million in misappropriated funds.

42. At a City Council meeting on February 27, 2024, Councilmember Lisa Kaplan publicly expressed concerns about Step Up, citing a need for accountability and doubt whether funds were reaching Program participants. On June 25, 2024, the same Councilmember expressed concern about mismanagement of funds and proposed withholding further funding pending a financial audit of Step Up.

43. In 2025, the City's own audit report documented Step Up's failures, finding among other things that "the rules for the program are not adequately communicated… participants… did not feel like they were receiving sufficient assistance from the service providers and sought more consistent interface with their case manager and housing navigators."

44. Despite this knowledge, the City retained Step Up as the administrator of a program serving the City's most vulnerable residents, renewing Step Up's contract twice more — in February 2025 and February 2026 — after these public warnings.

**C. The "Transition": No Notice, Defective Notice and False Assurances on Which Plaintiffs Reasonably Relied to Their Detriment**

45. On or about March 2026, Step Up began holding a series of "town halls" at Program locations. No formal written notice of these events was given; multiple Plaintiffs were unaware the town halls occurred or learned of them only days before.

46. At the town halls, Step Up staff stated verbally that the Program would end on June 1, 2026, that participants would transition to a new Emergency Shelter Voucher for Families program with multiple motel options to choose from, that every household was

COMPLAINT - 16

guaranteed a placement, and that participants did not need to take any action themselves. Step Up representatives were unable to answer basic questions about the transition.

47.     From March 2026 through June 2026, Step Up case managers repeatedly reassured Plaintiffs, verbally and by text message, that they were guaranteed placements. Motel management reaffirmed those assurances through at least two written notices taped to Plaintiffs' doors. Plaintiffs reasonably relied on these representations and, in reliance, refrained from pursuing alternative shelter arrangements they otherwise would have sought.

48.     The earliest any Plaintiff received notice of the June 1 displacement itself was on or about Friday, May 29, 2026 — via informal verbal statements or group text messages — for a displacement occurring Monday, June 1, 2026. Sacramento City Hall, where the City's reasonable-accommodation request forms must be obtained and submitted, is closed on weekends.

### D. June 1, 2026: The Lockout

49.     On or about May 30, 2026, Plaintiffs residing at Motel 6 Northgate, Motel 6 Jibboom, Motel 6 Collegetown, and Arden Acres were told, verbally or by text message from their Step Up case managers, to remove their belongings and leave their units from approximately 8:00 a.m. to 3:00 p.m. on June 1, 2026 "so that the units could be cleaned" — mirroring the weekly cleaning routine that had been standard throughout the Program — and that on their return, motel management would tell them where to relocate. Plaintiffs complied in good faith.

50.     When Plaintiffs returned as instructed, motel management told them no placement had been secured. Some, including the Murphy/Merritt household, were refused re-entry without explanation while other households were re-admitted. Others, including Plaintiffs Palaca and

COMPLAINT - 17

Cash, were not told until approximately 5:00–5:30 p.m. — after hours of waiting outdoors in the heat with children and, for some, with disabilities — that they would not be permitted to return to their rooms. Plaintiff Gonzalez's room key was deactivated while she was still retrieving her belongings.

51.    Plaintiffs Peete, Stotts, O'Ray, Riddle, Hearst, Green, Broadway, Household A, Rubio, Gonzalez, Cash, Lowe, Palaca, Heckart, Smith, Williams, Murphy, Merritt, Gore, Mariah Murphy, Lockett and other Sacramento Homeless Union members were thereby dispossessed of their housing units and are experiencing homelessness or acute housing insecurity, unable to use the vouchers nominally afforded them and unable to pay for the motels to which they were referred or for any alternative housing.

### E. The "DNR" List

52.    When certain Sacramento Homeless Union members— including Palaca, Rubio, Miller, Moore, and Cash — attempted to secure placements at motels on the list Step Up provided, the motels informed them that they had been designated "DNR" ("Do Not Register") and refused them rooms. , the DNR list was created, maintained, communicated, and enforced by Step Up and the Motel Defendants in the administration of the City's Program.

53.    No Plaintiff received advance notice of a DNR designation, a statement of reasons, any articulated standard governing the designation, or any opportunity to contest, appeal, or correct it — before or after the designation. The designation operated as a categorical exclusion from the shelter benefits to which Plaintiffs remained entitled under the successor program.

COMPLAINT - 18

**F. Destruction of Plaintiffs' Personal Property**

54.     Plaintiffs were never offered any option to store their belongings. , on June 1, 2026, Step Up case managers and/or motel management told Plaintiffs to discard any property beyond what they could carry or load into private vehicles that day, and remaining property was placed on the street and seized or discarded by the Motel Defendants and Arden Acres acting on behalf of the Program. Displaced Plaintiffs had no access to moving vehicles or storage.

55.     Plaintiff Stotts was expressly told by Arden Acres that she could leave her belongings temporarily and return for them; Arden Acres instead discarded them, including her four-year-old son's toys. Plaintiff Cash's belongings were placed outside her rooms, where food spoiled in the heat, with no instructions for retrieval or safeguarding. , other Plaintiffs' property was seized or discarded in the same manner; because Plaintiffs remain displaced and this emergency is ongoing, Plaintiffs have not had adequate opportunity to complete an inventory of property losses, and these facts are subject to proof after a reasonable opportunity for investigation and discovery.

**G. The Aftermath**

56.     The displaced Plaintiffs, parents and caretakers of some 45 children across the affected households, including two infants — have slept in vehicles, parking lots, and parks during a period in which Sacramento experienced triple-digit temperatures. One parent of Household A collapsed from heat exhaustion while carrying a four-month-old infant, and the family's belongings were stolen while the parent lay unconscious. Plaintiff Rubio's sons were held at gunpoint. Plaintiff Murphy cannot reliably power the nebulizer he needs to breathe. Children have lost access to schooling, disability related individual education plants "IEP's" at

COMPLAINT - 19

their schools, including counselors and medically required therapies. Children with autism and ADHD have suffered severe dysregulation and regression, including enuresis.

57.    Displaced Plaintiffs are further subject to ongoing displacement under the City's anti-camping ordinances and enforcement practices, including destruction of tent and tarp shelters, seizure of survival items, and towing of vehicles used for shelter — compounding the danger the City itself created.

58.    The City has publicly acknowledged, on city websites, in public pronouncements, and in a joint statement of the Mayor and City Manager, both its obligation to protect vulnerable unhoused residents and the failures in the administration of the Program. It has nevertheless offered no remedy and has not altered course.

### H. The Arden Acres Evictions

59.    Plaintiffs Parks, Criswell-Tippins, Doxie, Brooks, Miller, Moore, and Saito, are the only families that remain at Arden Acres after dozens of other long-term residents of Arden Acres under the City Motel Program were simply pushed out by Arden Acres' management when its contract with the City of Sacramento ended at the end of March. These ejected residents were never served with formal, signed eviction notices, let alone notices stating just cause.  The only communications they received were misleading flyers taped to the door, false assurances about where they could go, verbal announcements and sparsely attended "town halls" for which little or no notice was provided where the residents were told the City Motel Program was ending, that Arden Acres was "closing" and that they needed to call 211 and get hotel vouchers.

60.  But unable to use the vouchers offered by the City and having no place to go where they and their children can be safe, Plaintiffs Parks, Criswell-Tippins, Doxie, Miller, Moore and Saito remained and continue to remain in their units, unwilling to risk the lives and safety of their

COMPLAINT - 20

variously disabled family members and children on the streets. Thus, on March 28, 2026, Arden Acres Management served defective "3-day Notices to Pay Rent or Quit" on these Plaintiffs, expressly acknowledging their legal status as tenants and advising that failure to pay rent or quit would result in the filing of unlawful detainers against them.

## V. STATE ACTION

61.  At all relevant times, Step Up, the Motel Defendants, and Arden Acres (collectively, the "Private Defendants") acted under color of state law within the meaning of 42 U.S.C. § 1983 under each of the following independent theories.

### *Delegated public function.*

62. The City delegated to the Private Defendants the administration of a government shelter program that the City itself conceived, designed, funded with public money, and was obligated to oversee — including intake, case management, placement, transfer, exclusion (the DNR list), and termination of shelter benefits. The Private Defendants did not merely rent rooms; they decided, on the City's behalf, who received, kept, and lost publicly funded shelter, exercising a function the City had assumed toward persons in its charge.

### *Joint action*

63.  The Private Defendants were willful participants in joint activity with the City: they executed the City's decision to terminate the Program, carried out the coordinated June 1, 2026 vacate-and-lockout operation, jointly administered and enforced the DNR exclusion list, and disposed of participants' property, all pursuant to and in concert with City direction and funding.

### *Governmental nexus and ratification.*

64.  The City compensated the Private Defendants for each Program placement, retained contractual oversight and final authority over Program rules, placements, and exclusions, and,

COMPLAINT - 21

with knowledge of the June 1 events, has ratified the Private Defendants' conduct by publicly acknowledging the failures while continuing the displacement, the DNR exclusions, and the Arden Acres evictions.

65.   In the alternative, and at minimum, the City is directly liable for its own conduct: its officials designed and ordered the Program termination, funded and directed the transition, and failed to impose any procedures protecting participants, and the constitutional deprivations alleged herein were the direct and foreseeable product of the City's own policies and decisions.

## VI. MUNICIPAL LIABILITY

66.   The City is liable for the constitutional violations alleged herein because those violations were caused by the City's own official policies, customs, and decisions, on each of the following independent grounds:

### *Official policy and acts of final policymakers*.

67.   The decisions to create, structure, fund, extend, and terminate the Program — including the decision to end it on June 1, 2026 without written notice, without pre-deprivation process, without accommodation procedures, and without secured replacement placements — were made by the City's final policymakers, including the City Council and City Manager, and constitute official municipal policy.

### *Policy of deliberate indifference in retention and supervision.*

68.   With actual knowledge of Step Up's record — the Attorney General's fraud action, the 2024 retaliatory-eviction lawsuit, its own Councilmember's public warnings in February and June 2024, and its own 2025 audit — the City repeatedly renewed Step Up's contract (February 2025, February 2026) and continued to delegate to Step Up unchecked authority over shelter benefits, without imposing notice, hearing, accommodation, or property-safeguard procedures.

COMPLAINT - 22

This course of conduct constitutes deliberate indifference to the known and obvious consequence that participants' constitutional rights would be violated.

### Custom and practice.

69.  The Program was administered through longstanding, widespread practices — informal-only notice, unilateral denial of accommodations, the standardless DNR exclusion list, and summary property disposal — so persistent and well-settled as to constitute a custom or usage with the force of law.

### Ratification.

70.     With full knowledge of the June 1, 2026 events, the City's final policymakers — including through the joint statement of the Mayor and City Manager acknowledging the Program's failures — approved and maintained the conduct and its basis, continuing the displacement, the DNR exclusions, and the Arden Acres evictions without remedy.

## VII. GOVERNMENT CLAIMS ACT COMPLIANCE

71.  As to the state-law damages claims against the City alleged herein, Plaintiffs intend to file a timely claim under the California Torts Claim Act for damages complained herein for damages, but presently moves for declaratory and injunctive relief.

## VIII. STANDING

72.  Each individual Plaintiff has suffered concrete, particularized, and actual injury — loss of shelter, destruction of property, denial of accommodations, exclusion from public benefits without process, and physical and emotional harm — fairly traceable to Defendants' conduct and redressable by the relief sought. The Union has associational standing to seek declaratory and injunctive relief on behalf of its members, because its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to its purpose, and neither

COMPLAINT - 23

the claims asserted nor the relief requested requires the participation of individual members. The Union also has organizational standing in its own right based on the diversion of its resources to counteract Defendants' conduct.

## FIRST CAUSE OF ACTION
**42 U.S.C. § 1983: Fourth Amendment (Unreasonable Seizure of Property)**
**(Sacramento Homeless Union, Peete, Stotts, O'Ray, Riddle, Hearst, Green, Broadway, Household A, Rubio, Gonzalez, Cash, Lowe, Palaca, Heckart, Smith, Williams, Murphy, Merritt, Gore, Mariah Murphy, and Lockett against All Defendants)**

73.  Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

74.  The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, protects against unreasonable seizures of property. A seizure of property occurs upon any meaningful interference with an individual's possessory interests in that property, and the protection extends fully to the personal possessions of unhoused persons.

75.  *Possessory interest.* Each of the above-named Plaintiffs owned and possessed personal property in their Program units, including clothing, medications, medical equipment, children's belongings, documents, and basic survival items.

76.  *Meaningful interference by persons acting under color of state law.* On June 1, 2026, Defendants — Step Up case managers and motel and park staff acting under color of state law as alleged in Section V, on behalf of the City's Program — directed Plaintiffs to abandon all property they could not carry that day, placed Plaintiffs' remaining property on the street, and seized and discarded it. Arden Acres discarded Plaintiff Stotts's belongings after expressly telling her she could return for them. Plaintiff Cash's property was placed outside her rooms where it spoiled and was lost.

COMPLAINT - 24

77. *Unreasonableness.* The seizure and summary destruction of Plaintiffs' property — without notice, without any opportunity to retrieve or store it, without inventory, and without the procedures California law itself mandates for found or dispossessed property, *see* Cal. Civ. Code § 2080 et seq. (requiring reasonable efforts to return property or deliver it to police, who must hold it for at least 90 days) — was objectively unreasonable. No exigency, warrant, or governmental interest justified immediate destruction rather than storage.

78. The City is liable for this violation on the grounds alleged in Section VI; the Private Defendants are liable as joint actors and delegatees as alleged in Section V.

79. As a direct and proximate result, Plaintiffs lost personal, household, and irreplaceable property and suffered emotional distress, and are entitled to compensatory damages, and to punitive damages against the Private Defendants, whose conduct was malicious, oppressive, or in reckless disregard of Plaintiffs' rights. Because Plaintiffs remain displaced, a complete inventory of losses will be supplied after a reasonable opportunity for investigation and discovery.

## SECOND CAUSE OF ACTION
**42 U.S.C. § 1983: Fifth and Fourteenth Amendments
(Uncompensated Taking), Pleaded in the Alternative
(Sacramento Homeless Union, Stotts, and all Plaintiffs whose property was appropriated,
against Defendants City, Step Up, Motel Defendants, and Arden Acres)**

80. Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

81. The Takings Clause of the Fifth Amendment, applicable to local government through the Fourteenth Amendment, prohibits the taking of private property for public use without just compensation. A property owner may assert a takings claim under 42 U.S.C. § 1983 as soon as the taking occurs, without first exhausting state remedies.

COMPLAINT - 25

82. *Private property.* Plaintiffs owned the personal property described above. This also included intangible property, such as entitlements to benefit equally from the Program, that they received as Program beneficiaries.

83. *Taking for public use.* Application of the DNR list meaningfully interfered with Plaintiffs benefits under the Program. In the alternative to the First Cause of Action, to the extent Defendants' appropriation and disposal of Plaintiffs' property is characterized not as a law-enforcement seizure but as an exercise of the City's administration of its shelter program — clearing Program units for the City's programmatic purposes — Defendants physically appropriated and destroyed Plaintiffs' property in service of a public program.

84. *No just compensation.* Plaintiffs received no compensation, no receipt, and no process of any kind; Defendants acquired no title.

85. As a direct and proximate result, Plaintiffs are entitled to just compensation in an amount according to proof.

**THIRD CAUSE OF ACTION**
**(Title II of the ADA, 42 U.S.C. § 12131 et seq., and**
**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (against the City);**
**Title III of the ADA, 42 U.S.C. § 12181 et seq.**
**Plaintiffs Sacramento Homeless Union Saito, Criswell-Tippins, Miller, Heckart, Patrick**
**Murphy, Green, Williams, Parks, Smith, Simpson, Stotts, Lowe, Gonzalez, Peete, Lockett,**
**and Rubio against All Defendants.)**

86. Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

87. Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132. A public entity may not discriminate directly "or through contractual,

COMPLAINT - 26

licensing, or other arrangements." 28 C.F.R. § 35.130(b)(1). A public entity must make reasonable modifications to policies, practices, and procedures where necessary to avoid discrimination on the basis of disability, 28 C.F.R. § 35.130(b)(7), and must operate each program, viewed in its entirety, so that it is readily accessible to individuals with disabilities, 28 C.F.R. §§ 35.130(b)(3), 35.150(a).

88.    *Qualified individuals with disabilities.* Many Sacramento Homeless Union member and each above-named Plaintiff (or their minor child) is an individual with a physical or mental impairment that substantially limits one or more major life activities, 42 U.S.C. § 12102, including congestive heart failure, stroke, degenerative disc disease, diabetes, severe neuropathy, COPD, lupus, mobility impairments requiring a walker and service animals, autism (including Level III nonverbal autism), ADHD, PTSD, bipolar disorder, borderline personality disorder, major depression, postpartum depression, and immune deficiency. Each was enrolled in and eligible for the Program, and Defendants documented these disabilities at intake and throughout case management.

89. *Denial of benefits and discrimination by reason of disability.* The City, directly and through its contractual arrangements with Step Up and the participating motels: (a) wound down the Program and effected the June 1 displacement through a process — informal notice of 72 hours or less, spanning a weekend during which City Hall and its accommodation process were inaccessible. This made it impossible for Plaintiffs to request or receive reasonable accommodations before losing shelter in order equally benefit from the changes in program as those without disabilities (b) through Step Up case managers and motel staff, Defendants unilaterally denied accommodation requests, including Plaintiff Lockett's repeated written requests and Plaintiff Gonzalez's requests for a ground-floor unit for her son's autism-related

COMPLAINT - 27

safety needs, on the stated ground that Motel 6 is "privately owned" and "do[es] not make accommodations"; (c) offered replacement placements (upper-floor rooms, shelters that refuse children, 28-day check-out/check-in cycles) that are inaccessible to or discriminatorily burden Plaintiffs with mobility impairments and children with autism; and (d) penalized Plaintiffs, including Plaintiff Lockett, for the very accommodations their disabilities require.

90.   *Reasonable modifications were available.* Modifications including advance written notice, an accessible accommodation-request process, ground-floor placements, continuity of placement for households with disabled members, and transition assistance would not have fundamentally altered the Program.

91. *Deliberate indifference.* Defendants had actual knowledge of Plaintiffs' disabilities and accommodation needs from intake documentation and ongoing case management, and from Plaintiffs' express requests, and failed to act on that knowledge. Plaintiffs are accordingly entitled to compensatory damages against the City, as well as injunctive relief.

92. *Section 504.* The Program received federal financial assistance through the Emergency Service Grant Program "ESG" program authorized by subtitle B of title IV of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11371-11378) *see* 24 C.F.R. part 576. Therefore the City's conduct alleged above likewise violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which incorporates the same standards for federally funded programs.

93. *Title III against the Motel Defendants.* Each Motel 6 location is a place of public accommodation, 42 U.S.C. § 12181(7)(A). The Motel Defendants discriminated against Plaintiffs on the basis of disability in the full and equal enjoyment of their accommodations, 42 U.S.C. § 12182(a), including by refusing reasonable modifications, § 12182(b)(2)(A)(ii), denying service-animal accommodations, and disclaiming any obligation to accommodate. Motel

COMPLAINT - 28

6 Operating L.P. previously entered a settlement agreement with the United States in 2004 acknowledging its ADA accessibility obligations. Plaintiffs seek injunctive relief under 42 U.S.C. § 12188.

## FOURTH CAUSE OF ACTION
**(Violation of California Tenant Protections: Civ. Code §§ 1946.2 (Tenant Protection Act), 1946.1, 789.3, and 1940.2**
**Arden Acres Plaintiffs against Arden Acres; displaced motel Plaintiffs against Step Up and the Motel Defendants)**

94.  Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

95.  *Tenancy status.* Plaintiffs residing at Arden Acres are tenants: they occupied their units as their residences for extended periods — Plaintiff Criswell-Tippins for more than one year — and Arden Acres has acknowledged their tenancy status in writing. Plaintiffs residing in the Program motels continuously occupied their units as their sole residences for periods far exceeding 30 days — in some cases years — and  were not subject to the transient-occupancy exemption of Civ. Code § 1940(b).

96.  *Civ. Code § 1946.2 (just cause).* Arden Acres was constructed more than 15 years ago and is not exempt from the Tenant Protection Act. Plaintiffs who occupied their Arden Acres units for more than 12 months, including Plaintiff Criswell-Tippins, could not lawfully have their tenancies terminated without: (a) written notice stating just cause (at-fault or no-fault), Civ. Code § 1946.2(a); (b) for no-fault terminations, relocation assistance equal to one month's rent or rent waiver, § 1946.2(d); and (c) statutorily compliant notice periods, Civ. Code § 1946.1 (60 days for tenancies over one year; 30 days otherwise) or, for at-fault terminations, the notice required by Code Civ. Proc. § 1161. Arden Acres provided none of these: no signed written notice, no

COMPLAINT - 29

stated cause, no relocation assistance — only verbal statements at poorly noticed town halls and vague, unsigned flyers containing false information.

97. *Civ. Code § 789.3 (lockout).* Section 789.3(b)(1) prohibits a landlord, with intent to terminate occupancy, from willfully preventing a tenant from gaining reasonable access to the property by changing the locks or removing the tenant's personal property without prior written consent. Defendants Step Up and the Motel Defendants, with intent to terminate Plaintiffs' occupancies, induced Plaintiffs to surrender their key cards at 8:00 a.m. on June 1, 2026 on the false pretense of routine cleaning, then deactivated keys and denied re-entry, and removed and disposed of Plaintiffs' personal property without written consent. Plaintiffs are entitled under § 789.3(c) to actual damages plus statutory damages of $100 per day of violation (minimum $250) and reasonable attorney's fees.

98. *Civ. Code § 1940.2 (wrongful means to influence vacatur).* Section 1940.2(a) prohibits using fraud, intimidation, or menace to influence a tenant to vacate, and prohibits theft of tenant property in violation of Penal Code § 484. Defendants' false representations — that units were being vacated for cleaning, that return and placement were guaranteed — were made to induce Plaintiffs to vacate, and did induce them to vacate. Plaintiffs are entitled to statutory damages of up to $2,000 per violation, § 1940.2(b), in addition to actual damages.

99. *Willfulness.* Defendants' conduct was willful and undertaken pursuant to a coordinated plan, entitling Plaintiffs to the statutory remedies above and, under Civ. Code § 1946.2(h) as applicable, to treble actual damages and punitive damages for violations undertaken in bad faith.

//

COMPLAINT - 30

## FIFTH CAUSE OF ACTION
### (42 U.S.C. § 1983: Fourteenth Amendment Procedural Due Process
### All Plaintiffs against All Defendants)

100.   Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

101.   The Due Process Clause of the Fourteenth Amendment prohibits the deprivation of life, liberty, or property without due process of law. Its essential requirements are notice reasonably calculated to apprise the interested party, an opportunity to be heard at a meaningful time and in a meaningful manner, and a decision by a neutral decision-maker.

102.   *Protected property interests.* Plaintiffs possessed constitutionally protected property interests in: (a) their continued receipt of shelter benefits under the Program and its successor voucher program, in which they were enrolled, for which they remained eligible, and as to which the City's program rules, contracts, and repeated express assurances of guaranteed placement created a legitimate claim of entitlement; (b) their tenancies and continued occupancy of their units; and (c) their personal property, protected against summary destruction, *see* Cal. Civ. Code § 2080 et seq.

103.   *Protected liberty interests.* The standardless "DNR" designation — a stigmatizing exclusion list branding Plaintiffs as unfit to register, communicated to third-party motels and operating to bar Plaintiffs from public shelter benefits — deprived Plaintiffs of a protected liberty interest by imposing a stigmatizing designation together with the loss of a government benefit.

104.   *Deprivation without process.* Defendants deprived Plaintiffs of each of these interests with no process whatsoever: no written notice of termination of benefits; no statement of reasons; no articulated standards governing placement, exclusion, or the DNR list; no pre-

COMPLAINT - 31

deprivation hearing or post-deprivation review; and no neutral decision-maker — indeed, with affirmative misrepresentations (guaranteed placement; vacate for cleaning) that disabled Plaintiffs from protecting their own interests. The accommodation process the City nominally offered was inaccessible during the only period in which it could have mattered.

105.    *The balance of interests.* The private interests at stake — shelter for disabled adults and children, protection from summer heat, and safety from identified abusers — are of the highest order; the risk of erroneous deprivation under a process consisting of secret lists, false pretenses, and same-day lockouts is extreme; and pre-deprivation written notice and an informal opportunity to be heard would have imposed minimal fiscal or administrative burden on the City.

106.    The City is liable on the grounds alleged in Section VI; the Private Defendants are liable as state actors as alleged in Section V. As a direct and proximate result, Plaintiffs suffered the loss of shelter, property, and benefits, and consequential physical and emotional injury, entitling them to damages and injunctive relief, including restoration of benefits and constitutionally adequate procedures before any future exclusion or termination.

## SIXTH CAUSE OF ACTION
**(42 U.S.C. § 1983: Fourteenth Amendment Substantive Due Process State-Created Danger
All Plaintiffs against All Defendants)**

107.    Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

108.    State actors violate the substantive component of the Due Process Clause when, by affirmative conduct, they place a person in a position of actual, particularized danger the person would not otherwise have faced, with deliberate indifference to a known or obvious danger.

109.    *Affirmative acts.* Defendants did not merely decline to provide shelter. They: (a) induced Plaintiffs, by the false pretense of routine cleaning and months of express assurances of

COMPLAINT - 32

guaranteed placement, to vacate the shelter they had, to forgo alternative arrangements, and to surrender their keys; (b) deactivated keys and locked Plaintiffs out; (c) confiscated and destroyed the survival property Plaintiffs would otherwise have had; (d) designated Plaintiffs "DNR," affirmatively barring them from the replacement shelter the City itself identified; and (e) continue affirmatively to displace Plaintiffs from interim shelter through anti-camping enforcement, seizure of survival items, and vehicle towing.

110. *Actual, particularized, and foreseeable danger.* These acts placed identified, known individuals — elderly and disabled adults, children with autism and immune deficiencies, and survivors hiding from identified abusers — into triple-digit heat without shelter, exposed protected addresses, and stripped families of the means of survival: dangers Plaintiffs did not face while housed, and which have already materialized in a parent's heat collapse while holding an infant, children held at gunpoint, and a veteran deprived of the electricity his breathing equipment requires.

111. *Deliberate indifference.* Defendants had documented, individualized advance knowledge of every household's composition and vulnerabilities — such documentation was a condition of Program entry and was continuously updated by Step Up's case management — and the City has publicly acknowledged the failures while refusing any remedy and continuing the Arden Acres evictions and anti-camping displacement. Defendants recognized the unreasonable risk and actually intended to expose Plaintiffs to it or were deliberately indifferent to it. This conduct is so arbitrary and egregious that it shocks the conscience.

112. The City is liable on the grounds alleged in Section VI; the Private Defendants are liable as state actors as alleged in Section V. Plaintiffs are entitled to damages and to injunctive

COMPLAINT - 33

relief restraining the Arden Acres evictions, the DNR exclusions, and displacement of Plaintiffs from interim shelter.

## SEVENTH CAUSE OF ACTION
### (Negligent Hiring, Retention, and Supervision All Plaintiffs against the City (Gov. Code §§ 815.2, 820) and Step Up)

113.   Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein114.   Under California law, an entity is liable for negligently hiring, retaining, or supervising a person or contractor when: (1) the entity engaged the person; (2) the person was unfit or incompetent to perform the work; (3) the entity knew or should have known of the unfitness and that it created a particular risk to others; (4) the unfitness harmed the plaintiff; and (5) the negligent hiring, retention, or supervision was a substantial factor in causing the harm.

114.   A public entity is vicariously liable under Government Code § 815.2 for the negligence of its employees, including employees responsible for hiring, retaining, and supervising the entity's contractors. The City owed Program participants — vulnerable persons it undertook to shelter — a duty of care in selecting and supervising the entities to which it entrusted them.

115.   *Engagement.* The City hired Step Up in 2020 and renewed or extended its contract four times, most recently in February 2026; Step Up in turn engaged and supervised the case managers and coordinated the participating motels.

116.   *Unfitness, and the City's knowledge of it.* As alleged in Section IV.B, by 2024–2025 the City had actual knowledge — through the Attorney General's fraud action (settled June 29, 2026 for $3 million), the 2024 retaliatory-eviction and lockout lawsuit, its own Councilmember's repeated public warnings, its own 2025 audit, and participants' complaints —

COMPLAINT - 34

that Step Up was unfit to administer shelter services for vulnerable families and that its unfitness posed a particular risk of precisely the harm that occurred: wrongful displacement of vulnerable participants.

117. *Harm and causation.* Step Up's incompetence — false assurances, the botched June 1 transition, unresponsive case managers, the standardless DNR list, and property disposal — was a substantial factor in causing Plaintiffs' loss of shelter, property, and physical and emotional injury. The City's retention of Step Up despite its knowledge, and its employees' failure to supervise Step Up's administration of the Program, were likewise substantial factors.

118. This cause of action is asserted against the City for damages subject to the Government Claims Act compliance alleged in Section VII, and against Step Up directly. As a direct and proximate result, Plaintiffs suffered damages according to proof.

## EIGHTH CAUSE OF ACTION
### (Breach of Mandatory Duties: Cal. Gov. Code § 815.6
### Violation of Shelter Program Standards
### All Plaintiffs against the City; negligence per se against Step Up)

119. Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

120. Government Code § 815.6 renders a public entity liable where: (1) an enactment imposes a mandatory, not discretionary, duty; (2) the enactment was designed to protect against the kind of injury suffered; and (3) the entity's breach of the duty proximately caused the injury.

121. The Program was subject to mandatory shelter standards imposed by the enactments and funding conditions governing it, including but not limited to 24 C.F.R. Part 576 et seq, McKinney-Vento Homeless Assistance Act (42 U.S.C. 11371-11378), and the City's own written policies which imposed mandatory duties concerning, among other things, written notice before termination of shelter, grievance procedures, habitability, and transition planning.

COMPLAINT - 35

122.   Those standards were designed to protect shelter participants against precisely the injuries suffered here: abrupt, procedureless loss of shelter and its physical and emotional consequences. Defendants breached those duties as alleged herein, and the breaches proximately caused Plaintiffs' injuries. The same violations constitute negligence per se as against Step Up. This cause of action is subject, as to damages against the City, to the Government Claims Act compliance alleged in Section VII.

### NINTH CAUSE OF ACTION
**(Violation of the California Fair Employment and Housing Act, Gov. Code § 12955 et seq.: Housing Discrimination and Failure to Provide Reasonable Accommodations to Plaintiffs Sacramento Homeless Union, Saito, Criswell-Tippins, Miller, Heckart, Patrick Murphy, Green, Williams, Parks, Smith, Simpson, Stotts, Lowe, Gonzalez, Peete, Lockett, and Rubio against All Defendants)**

123.   Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

124.   *The statutory framework.* The Fair Employment and Housing Act ("FEHA") makes it Unlawful for the owner of any housing accommodation to discriminate against or harass any person because of disability, Gov. Code § 12955(a), or otherwise to make housing opportunities unavailable on that basis, § 12955(k). "Discrimination" includes the refusal to make reasonable accommodations in rules, policies, practices, or services when necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling. Gov. Code § 12927(c)(1). "Owner" includes lessees, managing agents, and any person having the right to rent or lease housing accommodations, and expressly includes the state and its political subdivisions, § 12927(e); "housing accommodation" means any building or portion thereof occupied as the home or residence of one or more persons, § 12927(d). The Program units at Motel 6 Northgate, Motel 6 Jibboom, Motel 6 Collegetown, the Executive Inn, and Arden Acres, occupied by Plaintiffs as

COMPLAINT - 36

their sole residences, are housing accommodations, and each Defendant — as owner, operator, managing agent, or program administrator exercising the right to rent and control those units — is an owner within the meaning of FEHA.

125.     *Disability.* Each above-named Plaintiff (or their minor child) has one or more physical or mental disabilities within the meaning of Gov. Code §§ 12926 and 12926.1, as alleged in the Third Cause of Action, and Defendants knew of those disabilities from intake documentation, ongoing case management, and Plaintiffs' express requests. FEHA's definition of disability is construed independently of, and more broadly than, its federal counterparts. *Discriminatory conduct and refusal to accommodate.* Defendants discriminated against Plaintiffs because of disability and refused reasonable accommodations by, among other things: (a) denying accommodation requests outright — including Plaintiff Lockett's repeated written requests and Plaintiff Gonzalez's requests for a ground-floor unit necessitated by her son's autism-related safety needs — on the stated ground that Motel 6 is "privately owned" and "do[es] not make accommodations"; (b) effecting the June 1 displacement through a process that was inaccessible to persons with disabilities and afforded no opportunity to request or receive accommodation before the loss of shelter; (c) offering replacement placements — upper-floor rooms, shelters that refuse children, 28-day check-out/check-in cycles — that are unusable by, or discriminatorily burden, Plaintiffs with mobility impairments, medical-equipment needs, and children with autism; and (d) disciplining Plaintiff Lockett for the very accommodations her disabilities require, in retaliation for her exercise of rights protected by FEHA, § 12955(f).*Remedies.* As a direct and proximate result, Plaintiffs suffered the loss of housing, physical injury, and emotional distress, and are entitled to actual damages, injunctive relief, punitive damages against the Private Defendants, and reasonable attorneys' fees and costs.

COMPLAINT - 37

Plaintiffs' FEHA claims are not subject to the claim-presentation requirements of the Government Claims Act. [CONFIRM administrative posture: CRD complaint and right-to-sue notice, or direct civil action under Gov. Code § 12989.1.]

**TENTH CAUSE OF ACTION**
**(Civil Conspiracy (All Plaintiffs against Defendants Step Up, the Motel Defendants, Arden Acres, and Does 1–100)**

126. Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

127. *Legal standard.* Civil conspiracy imposes joint and several liability on all who, pursuant to a common design, agree to commit tortious acts. Its elements are (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) resulting damage. A conspirator is liable for every tort committed pursuant to the conspiracy, whether or not the conspirator personally committed the act or benefited from it.

128. *Formation and operation.* , in the weeks preceding June 1, 2026, the Private Defendants — with the knowledge and participation of Step Up's management and of the operators of each participating property — agreed upon and coordinated a common plan to empty the Program units simultaneously and by deception: the uniform instruction, issued the same morning across multiple separately operated properties, to vacate by 8:00 a.m. for "cleaning"; the simultaneous deactivation of key cards; the circulation and common enforcement of the "DNR" list among independently operated motels; and the common disposal of Plaintiffs' property. The uniformity, timing, and coordination of these acts across independent businesses is not plausibly explained except by prior agreement and concerted action.

129. *Wrongful acts in furtherance.* In furtherance of the conspiracy, Defendants committed the wrongful acts alleged herein, including unlawful lockouts, the use of fraud and

COMPLAINT - 38

menace to induce vacatur the seizure and destruction of Plaintiffs' personal property, breach of the implied warranty of habitability, and intentional infliction of emotional distress.

130. *Damages and joint liability.* As a direct and proximate result, Plaintiffs suffered the loss of shelter and property and physical and emotional injury. Each Private Defendant is jointly and severally liable for all damages caused by acts committed pursuant to the conspiracy, and Plaintiffs are entitled to punitive damages under Civ. Code § 3294. This cause of action is asserted against the Private Defendants; the City's liability for the same course of conduct is alleged under the statutory and constitutional theories pleaded above.

## ELEVENTH CAUSE OF ACTION
**(Breach of the Implied Warranty of Habitability (All Plaintiffs against Defendants Step Up, the Motel Defendants, and Arden Acres)**
**Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.)**

131. Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

132. *Legal standard.* Under California law, every residential lease or rental agreement carries a non-waivable implied warranty of habitability requiring the landlord to maintain the premises in substantial compliance with applicable building and housing codes and the standards codified at Civ. Code § 1941.1. The elements of the claim are a materially defective condition affecting habitability, notice to the landlord within a reasonable time after discovery, a reasonable time for the landlord to correct the deficiency, and resulting damages. The warranty extends to Plaintiffs' Program units, which Plaintiffs occupied as their sole residences for periods far exceeding 30 days, as alleged in the Fourth Cause of Action.

133. *Defective conditions and notice.* Plaintiffs' units suffered from materially defective conditions affecting habitability, including the unsecured air-conditioning unit in

COMPLAINT - 39

Plaintiff Gonzalez's room that inflicted facial injuries on her two-year-old son, and other conditions of disrepair, inadequate maintenance, and noncompliance with the standards of Civ. Code § 1941.1. Plaintiffs gave notice of these conditions to Step Up case managers and to motel and park staff, who had actual knowledge of them, and Defendants failed to correct them within a reasonable time — in Plaintiff Gonzalez's case, leaving the hazard unaddressed until after her son was injured.

134.   *Breach by exclusion.* Defendants' ultimate act — excluding Plaintiffs from their units entirely, without lawful process, and disposing of their belongings — deprived Plaintiffs of habitable premises altogether and constitutes a total breach of the warranty.

135.   *Damages.* As a direct and proximate result, Plaintiffs are entitled to damages including the difference between the value of the premises as warranted and as received, restitution of amounts paid or benefits conferred, and damages for discomfort, annoyance, and personal injury, in an amount according to proof.

## TWELFTH CAUSE OF ACTION
**Intentional Infliction of Emotional Distress (All Plaintiffs against All Defendants)**

136.   Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

137.   *Legal standard.* The elements of intentional infliction of emotional distress are (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) severe or extreme emotional distress; and (3) actual and proximate causation. Conduct is outrageous when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community, and its outrageousness is heightened where the defendant abuses a relation or position that gives it power to damage the

COMPLAINT - 40

plaintiff's interests, or proceeds in the knowledge that the plaintiff is peculiarly susceptible to emotional distress.

138.    *Outrageous conduct.* Defendants' conduct exceeds all bounds tolerated in a civilized society. Defendants lured families — including infants, children with autism, elderly and disabled adults, and survivors in hiding from identified abusers — out of their homes by the false pretense of routine cleaning; locked them out into triple-digit heat; discarded the medications, medical equipment, and survival property Plaintiffs left behind in reliance on Defendants' instructions; barred them from replacement shelter through a secret, standardless blacklist; and did so while holding documented, individualized knowledge of each household's composition and vulnerabilities, acquired as a condition of Program participation. Defendants occupied a position of complete power over Plaintiffs' access to shelter and exercised it against persons they knew to be peculiarly vulnerable.

139.    *Intent or reckless disregard.* Defendants acted with the intention of causing, or at minimum with conscious and reckless disregard of the near-certain probability of causing, severe emotional distress: no one who orchestrates the deception-based mass lockout of families with children into extreme summer heat, with the destruction of their belongings, can fail to appreciate that severe distress will result.

140.    *Severe distress and causation.* As a direct and proximate result, Plaintiffs suffered severe emotional distress that no reasonable person should be expected to endure, including terror, grief, humiliation, anxiety, and despair; the exacerbation of diagnosed PTSD, depression, and anxiety disorders; the trauma of children displaced from their homes and held at gunpoint while sheltering in vehicles; and the anguish of parents unable to protect infants and disabled children from heat, danger, and loss.

COMPLAINT - 41

141.    *Liability and damages.* The Private Defendants are directly liable; the City is vicariously liable for the acts of its employees under Gov. Code § 815.2, subject to the Government Claims Act compliance alleged in Section VII. Plaintiffs are entitled to compensatory damages and, against the Private Defendants, to punitive damages under Civ. Code § 3294.

## THIRTEENTH CAUSE OF ACTION
**(Negligent Infliction of Emotional Distress, Pleaded in the Alternative All Plaintiffs against All Defendants)**

142.    Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

143.    *Legal standard.* Negligent infliction of emotional distress is a form of the tort of negligence, requiring duty, breach, causation, and damages. Damages for serious emotional distress are recoverable where such distress is the foreseeable result of the breach of a duty owed directly to the plaintiff arising from a preexisting or special relationship or from an undertaking by the defendant.

143.    *Duty.* Defendants owed Plaintiffs a direct duty of care arising from the special relationships alleged herein: the City and Step Up undertook to shelter, case-manage, and transition vulnerable families and disabled adults whose household compositions and vulnerabilities they documented as a condition of Program entry, and the Motel Defendants and Arden Acres stood in the relationship of housing provider to resident. Serious emotional distress to persons deprived of shelter without notice, planning, or accurate information was a foreseeable — indeed inevitable — consequence of any breach of these duties.

144.    *Breach and causation, in the alternative.* In the alternative to the Twelfth Cause of Action, should the trier of fact find that Defendants' conduct was not intentional or reckless,

COMPLAINT - 42

Defendants nonetheless breached their duties of care by winding down the Program without written notice, transition planning, or accurate information; by giving false assurances of guaranteed placement on which Plaintiffs reasonably relied; by carelessly administering placements, the "DNR" list, and accommodation requests; and by disposing of Plaintiffs' property without inventory or safeguard. Each breach was a substantial factor in causing Plaintiffs' emotional distress.

145. *Serious emotional distress; liability.* Plaintiffs suffered serious emotional distress of the character alleged above, such that a reasonable person would be unable adequately to cope with the mental stress engendered by the circumstances. The Private Defendants are directly liable; the City is vicariously liable under Gov. Code § 815.2, subject to the Government Claims Act compliance alleged in Section VII. Plaintiffs are entitled to damages according to proof.

## FOURTEENTH CAUSE OF ACTION
**(Violation of Article 1, Section 1 of the California Constitution, Right to Pursue and Obtain Safety Against all defendants.)**

146. Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

147. Article One, Section One of the California Constitution reads as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining *safety*, happiness, and privacy." (Emphasis added.) By participating in the City Motel Program, Plaintiffs had exercised their inalienable right to pursue and obtain a significant measure of protection from the universally recognized and undisputed dangers of being homeless and unsheltered on the streets.  By way of the acts described in this lawsuit, Defendants

COMPLAINT - 43

affirmatively increased the risk of harm and caused to happen actual harm to Plaintiffs thereby violating their right to pursue and obtain safety.

## FIFTEENTH CAUSE OF ACTION
**(Violation of Article 1, Section 7 of the California Constitution, Right to Due Process Against all defendants.)**

148. Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

149. Article 1, Section 7 of the California Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law, and ensures equal protection under the law. By failing to abide by the state and federal requirements to provide Plaintiffs with copies of the rules, rights, regulations and procedures regarding the previously existing City Motel Program and the removal of Plaintiffs therefrom without effective and meaningful pre-deprivation notice, opportunity to be heard, right to appeal to a neutral third party and other procedures, Defendants violated Article 1, Section 7 of the California Constitution.

## SIXTEENTH CAUSE OF ACTION
**(Breach of Contract, Third Party Beneficiaries; Promissory Estoppel; Fraud Against all defendants)**

150. Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

151. It is manifest by the plain language of the contracts between Defendant City of Sacramento and Step Up on Second Street, Inc. and contracts between the City and the participating motels in both the now terminated City Motel Program and the current Emergency Voucher Program as well as in City Council resolutions and official public statements by Defendant City of Sacramento that Plaintiffs and the class of homeless persons they represent

COMPLAINT - 44

were and are fully vested intended beneficiaries of these programs and contracts. By way of the acts described in this lawsuit, Defendants wrongfully breached and denied Plaintiffs the benefits of said contracts.

152.    To the extent that Defendants made verbal and written commitments to Plaintiffs of continued shelter, representations that vouchers would be accepted at participating motels and assistance in obtaining permanent housing would be provided on which Plaintiffs reasonably relied only to be fraudulently betrayed to their detriment, said promises were and are enforceable under the doctrine of promissory estoppel.

**SEVENTEENTH CAUSE OF ACTION**
**(Violation of the federal Violence Against Women Act (VAWA) (P.L. 103-322).**
**Against all Defendants)**

153. Plaintiffs reallege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

154.    The Violence Against Women Act, Public Law 103-322, is a federal law enacted in 1994 that includes housing protections for persons applying or living in units subsidized in whole or in part by the federal government who have experienced domestic violence, dating violence, sexual assault or stalking to help keep them safe and reduce their likelihood of experiencing homelessness. It applies to the programs at issue in this case, i.e., Sacramento's now-discontinued City Motel Program, its newly-created ESV program and to Defendants Step Up on Second, the participating Motels and to City officials named in this suit.

155.    Every person who applies for or receives any form of housing assistance must be informed of their full rights under VAWA so that they have the knowledge to exercise them. At minimum, this information must be provided when an applicant for housing assistance is denied admission to any permanent or transitional housing program or shelter that receives federal

COMPLAINT - 45

support or when they are notified that their assistance is ending. Plaintiffs in this lawsuit - which include victims of domestic violence identified as "Jane Does" - were never provided with this information by any Defendant.

156.    In addition, VAWA requires programs receiving federal funds such as the City of Sacramento's Emergency Shelter Voucher (ESV) program, must develop a written Emergency Transfer Plan (ETP) to allow victims of domestic violence to transfer to a new, safe unit if their current situation becomes unsafe. Plaintiffs are unaware of any Emergency Transfer Plan that either the City or contracted motel operators have ever developed. Instead, Defendants have used "do not register" lists at Defendant Motels and other means to prevent access to shelter by those covered by VAWA thus exposed them and their children at greater risk of harm.

## CONCLUSION

157.    "*I did not go quietly,*" said Plaintiff and Homeless Union member Ida Luckett who called in the media when she was kicked into the streets and refused disability accommodations by Defendant Motel 6 Northgate on the first day of June. Neither did the Arden Acres plaintiffs who remain in their units. And neither did the other thirty-two homeless Sacramentans who have added their names to this lawsuit and will shortly file signed, sworn detailed declarations in support of their Complaint that the Sacramento Homeless Union has worked tirelessly since June 1st to collect.

158.    Against a City with a 1.6 billion dollar budget and well-heeled contractors with keys to the public treasury, Plaintiffs have stood up and signed up and now turn to this Court to vindicate their inalienable constitutional right to "pursue and obtain safety".

COMPLAINT - 46

# X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.     For a temporary restraining order and preliminary and permanent injunctions:

(a) restraining Defendants from proceeding with eviction of Plaintiffs residing at Arden Acres Modular Home Park;

(b) restraining Defendants from excluding Plaintiffs from the Emergency Shelter Voucher for Families program, including by means of any "DNR" or similar designation, without prior written notice, a statement of reasons, and an opportunity to be heard;

(c) requiring Defendants to restore shelter placements to displaced Plaintiffs or provide equivalent non-congregate shelter;

(d) requiring Defendants to engage in the interactive process required and provide reasonable accommodations under Title II of the ADA;

(e) restraining Defendants from towing, clearing, seizing property from, or otherwise displacing currently unsheltered Plaintiffs pursuant to anti-camping ordinances pending resolution of this action; and (f) requiring Defendants to preserve, inventory, and return Plaintiffs' personal property in their possession;

2.     For a declaration that Defendants' conduct violated the Fourth, Fifth, and Fourteenth Amendments, Title II and Title III of the ADA, Section 504 of the Rehabilitation Act, and California law;

3.     For compensatory and consequential damages according to proof, including for loss of property, physical injury, and emotional distress;

4.     For just compensation under the Fifth and Fourteenth Amendments;

COMPLAINT - 47

5.     For statutory damages and penalties, including under Civ. Code §§ 789.3(c), 1940.2(b), 1946.2.

6.     For punitive and exemplary damages against Defendants Step Up, the Motel Defendants, Arden Acres, Defendant Brian Pedro and those Doe Defendants who may later be identified and be subject to such damages.

7.     For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a, Cal. Civ. Code §§ 52(a)(b)(3) and 789.3(c), and Code Civ. Proc. § 1021.5;

8.     For pre-judgment and post-judgment interest as permitted by law; and

9.     For such other and further relief as the Court deems just and proper.

### XI. DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 15, 2026

Respectfully submitted,
 /s/ Anthony D. Prince
Anthony D. Prince,
General Counsel,
California Homeless Union/
Statewide Organizing Council
Law Offices of Anthony D. Prince

(VERIFICATION OF COMPLAINT ON FOLLOWING PAGE)

//

//

//

//

//

COMPLAINT - 48

**VERIFICATION**

I, Crystal Rose Sanchez, in my official capacity as President of the Sacramento Homeless Union, lead organizational Plaintiff in the above-captioned action, declare the allegations of this Complaint are true of my own knowledge, except those made upon information and belief and, as to such statements, I believe them to be true.

Sworn under penalty of perjury under the laws of the United States of America.

Dated: July 15, 2026

Executed at Sacramento, California                    /s/ Crystal Sanchez,
                                                        Crystal Sanchez,
                                            President, Sacramento Homeless Union

COMPLAINT - 49